Case number 15-5207. Michael Roy Johnson, Appellant, v. DC, et al. Mr. Gilstrath for the Immigrants' Parade. Mr. Burnham for the Appellees. Mr. Gilstrath. Thank you, Your Honor, and may it please the Court. My name is Stephen Gilstrath, arguing on behalf of Amicus in support of Appellant Michael Johnson. I've reserved three minutes for rebuttal. The central issue here is whether Johnson has pleaded a viable ex post facto claim where the Parole Commission's retroactive application of the 2000 Guidelines flipped Johnson's status from presumptively suitable for parole to presumptively unsuitable. In particular, under the 2000 Guidelines, Johnson was deemed presumptively unsuitable for parole in 2000 and given a 12- to 18-month period of extended unsuitability. Had the 1987 Guidelines been applied, Johnson would have been presumptively suitable for parole and no extended period of unsuitability would have been added. Because the retroactive application of the 2000 Guidelines flipped the presumption and made him presumptively unsuitable for parole for a longer period, Johnson has alleged a viable ex post facto claim under this Court's decision in Daniel. And in the specific circumstances of this case, qualified immunity does not bar Johnson's claim. On the merits of the ex post facto claim, there is no dispute that the Commission applied the 2000 Guidelines at Johnson's 2000, 2005, and 2008 parole hearings. That's available at the government's brief at pages 5 and 6. And as in Daniel, the retroactive application of those Guidelines  Specifically, applying the 2000 Guidelines resulted in Mr. Johnson receiving base scores of 4 in the 2000, 2005, and 2008 parole hearings, and those scores are what added the 12- to 18-month period of unsuitability for Johnson. So there are two bases for the ex post facto claim. The first is this extended presumption of unsuitability, which arises from the Daniel case. In our briefing, we had raised a second basis, which was that the Parole Commission relied on factors in the 2000 Guidelines that we believe the 1987 Guidelines restricted them from relying on. And as Your Honor points out, and as we disclosed in our 28-J letter, Ford undercuts the second basis of that argument. While we believe that It pretty much demolishes it, doesn't it? For the most part, Your Honor, there are arguments that we pressed here under the textual differences between the 1987 Guidelines and the 2000 Guidelines that I don't believe were pressed in Ford, but for all intents and purposes, and that's why we're focusing our argument on the extended period of unsuitability and the flipping of the presumption under this Court's decision in Daniel. Under this Court's decision in Ford, they could have considered the same factors. Do you believe the sweep in Ford when they add to Bailey and Phillips, bringing up the undercut to the first argument? where Mr. Johnson's period of unsuitability was extended 12 to 18 months, which is the factual situation addressed in Daniel. So it's a difference in starting point. It's not saying that the Commission couldn't have considered the prior rate charge or something like that, but in considering that, they started from a guideline range under the 2000 Guidelines of 133 to 139 months, when absent applying the 2000 Guidelines, the range would have been 121 months. So this increased I believe under Daniel it does matter, because as the Court in Daniel specifically said, it's no answer to say that the ultimate sentence might have been the same or that the Commission has abundant discretion to depart, because all that matters While the criteria might have been the same, the period might have been very different, Your Honor. Why? Because you're starting from a different starting point. In 2000, had the 1987 Guidelines been applied, Johnson would have been presumptively suitable for parole. He was not in 2000 when the 2000 Guidelines were applied. So he was given a rehearing of 60 months. If he had started from a presumptively suitable for parole standpoint, it's very unclear, and on 12b-6, I think it's a reasonable inference, that his period of unsuitability would have been shorter and he would have likely gotten an earlier rehearing. So just because the Commission Well, the regulations command The regulations under 1987 compared to 2000 did not create an extended period of unsuitability. The 2000 Guidelines created this 12- to 18-month period. So he wasn't at 2000, at the 2000 hearing, Mr. Johnson wasn't even suitable for parole under the 2000 Guidelines when he would have been suitable for parole under the 1987 Guidelines. So when the Commission departed in 2000 and then later in 2005 and 2008, they were departing from a presumption of unsuitability in 2000. Had the 1987 Guidelines been applied, they would have been departing from a presumption of suitability for parole. So what's the relationship between the presumption and the 12- to 18-months? So the presumption is keyed off of the point score in the 1987 Guidelines. Two or under, you're deemed presumptively suitable for parole. Mr. Johnson received a three under the 2000 Guidelines. The record indicates he would have received a one in 2000. So it would have flipped the presumption. The 12- to 18-month period of extended unsuitability stems from what's called the base point score under the 2000 Guidelines. He was given a base point score of four at each of the hearings, which created that 12- to 18-month period of For the purpose of your argument, your view is that the presumption alone is enough, right? You think, put aside the 12- to 18-months, you think that there's a meaningful distinction between a presumption, one direction or the other, even though there's discretion to overcome the presumption? That's correct, Your Honor. I believe Daniel stands for that proposition. And even though Ford comes along later and says, even if the factors aren't enumerated, the fact that you can take into account the factors is enough? Correct. So there's a talismanic distinction in your view between discretion to consider factors and the establishment of a presumption, even if the presumption can be overcome if you take into account other factors? That's correct. And I think this Court's precedents in Daniel as well as Supreme Court precedents in related contexts make the point that the starting point matters in terms of sentencing in the Pew case. Granted, it was a slightly different context in terms of sentencing. But if you're applying a guideline range or a starting point with the presumption that's different, that affects the entire analysis. And in Ford and Bailey, you're dealing with a situation of where the argument is you couldn't have relied on factors that, as this Court held in Bailey and Ford, they could have been relied on, but they're two separate issues. Yeah. I appreciate the fact that you're not making the argument that Ford was a thoughtless opinion written by an indistinguished Federal judge. A very esteemed judge, Your Honor. But it has to be that you thought that you read Ford to mean that one could read Ford in the way that the colloquy earlier has been suggesting, which is to say as long as there's discretion to take into account whatever it is, then it doesn't matter that the guidelines speak in one way at time zero and in another way at time one. And if you did it at that level of generality, then that would deal with the presumption too. I believe, Your Honor, is correct that if you read it that way, it would impact our first argument. But respectfully, under this Court's earlier decision in Daniel, I don't think you can read Ford that broadly. Because Daniel makes very clear that discretion is not enough to overcome the ex post facto violation and it's not enough that the same ultimate sentence might have been arrived at. And I don't believe those statements in Daniel can be reconciled with this idea that any time the Commission could depart or could have considered these factors, that that somehow sweeps away an ex post facto violation. What about the fact then that in 2010, the right guidelines, I think even under your estimation, were applied and the decision was made in 2010 that their parole wasn't in the offing? Right, and I think 2010 in a lot of ways actually supports our ex post facto claim because while the 1987 guidelines were applied, the rehearing period after the 2010 hearing was 24 months, which was the shortest it had ever been, down from 60 months and 36 months at the other hearings, which suggests that starting from a different starting point and a starting point more favorable to Appellant Johnson, you had a shorter period of unsuitability and a lower departure upward relative to the earlier parole hearings under the 2000 guidelines. I believe we've covered Bailey and Ford as I figured we would. With the last couple of minutes, I'd like to address the issue of qualified immunity. Under the Supreme Court's decision in Garner, that's the benchmark case for the qualified immunity analysis that Johnson relies on because it stands for the proposition that a retroactive application of the guidelines that creates an increased risk of incarceration violates the ex post facto clause. The government has essentially asked this court for an earlier precedent on all fours. That's not what the qualified immunity test requires. This court's decision in Taylor v. Riley is applicable and stands for the proposition that if it would have been apparent to reasonable officials in 2000, that applying those 2000 guidelines either facially or as applied created a significant risk of increased incarceration, then qualified immunity would not serve as a bar. And while in Taylor it is true that under the specific facts of that case, the court did not find that a clearly established right had been violated, the violation's more apparent here. And Taylor recognizes that it's possible that qualified immunity might be overcome in the right circumstances. And the reason that the qualified immunity analysis is different here as opposed to in Taylor is the issue of achievement. As this court's opinion in Fletcher II held, one of the main distinctions between the 1987 guidelines and the 2000 guidelines was that the 2000 guidelines limited rehabilitative efforts relative to the 1987 guidelines. Specifically, under the 1987 guidelines and as the Parole Commission recognized in 2010 when it applied those guidelines, Mr. Johnson would have received a point deduction for sustained achievement at his 2000 hearing, his 2005 hearing, and his 2008 hearing. Under the 2000 guidelines, the standard was changed to where superior achievement was required to receive any benefit. And at each of those hearings, he was denied the benefit of superior achievement. So unlike the case in Taylor, you have a situation where as applied to Mr. Johnson, looking at the difference between sustained achievement versus superior achievement created the issue. And, in fact, in 2000 flipped the presumption and created the situation of having a 12- to 18-month period. So if I'm understanding correctly, the relationship between the qualified immunity argument and the merits argument, on the merits argument you say Daniel comes along and tells you that the presumption means something, and the fact that Ford comes along later and says that the existence of discretion is enough doesn't trump the Daniel notion for presumption. But for qualified immunity purposes, you'd have to say that a reasonable parole official back at that time would have to understand not only that Ford doesn't undo Daniel, but that it would have been unreasonable to think anything otherwise. Well, Ford hadn't come along by the time Mr. Johnson… Right, but the idea of Ford is an idea that's out there in the world that the existence of discretion is enough not to create a significant risk. I would characterize it as Daniel creates this presumption issue in this period of extended unsuitability. The one-point deduction that would have been required under the 1987 guidelines and that Mr. Johnson did not receive the benefit of, it would have been apparent to officials in 2000, 2005, 2008 that he did not receive that benefit that he would have received. And since we're talking about differences in point systems, reducing a point in fact in 2000 changes the presumption because he would have gone from a 3 to a 2, and that's a cutoff point from being presumptively suitable for parole. Right, but for ex post facto purposes and qualified immunity, it's not just that someone would have to look at it and see that the two systems are different. It's that someone would have to look at it and see that the two systems are so different that it creates an… Correct, Your Honor. And the issue with the one-point deduction for sustained achievement versus superior achievement is that's pretty clear on the face of comparing the two guideline range. We're not, as Taylor talks about in Apples and Oranges comparison, that's not the situation here when you look at that specific factor. If the Court has no further questions, I'll reserve the balance of my time. All right. Thank you. Mr. Bergen. Good morning, Judge Henderson. James Burnham on behalf of the Federal Appellees. I'd like to pick up right where Judge Narvasan left off. So Mr. Johnson has been released, which means that all that is remaining is his claim for money damages against the commissioners. Under the Supreme Court's decision in Pearson v. Callahan, and it's in many cases after,  It need not assess whether or not the commissioners whether there was an ex post facto issue to begin with. And I think it's pretty clear under this Court's cases that it was not clearly established in 2000, 2005, or 2008 when the relevant parole determinations were made that there was a clearly established rule against using the 2000 guidelines in the case of Mr. Johnson. I think that's clear from Ford v. Massarone. I think the fact that one could read Ford v. Massarone to say that the latter enacted guidelines do not create a significant risk over the prior enacted guidelines is enough for the qualified immunity analysis to preclude any claim for money damages here. I would also just say that the suitability argument that Amicus has raised is taken off the table by the commission's decision in 2010 to voluntarily recalculate all of Mr. Johnson's parole hearings using the 2010 guidelines. Because we actually know, as a matter of fact, because it happened, that when the commission recalculated his parole determinations using the parole guidelines in effect on the date of his conviction, that it denied parole for the same reasons it had given under the 2000 guidelines. So that's what happened in 2010. So just to go back to where you started, Amicus's argument is that there's something talismanic about a presumption. And so even for qualified immunity purposes, you'd have to know, looking at the state of play, that the absence or presence of a presumption changes everything and that ex post facto principles just dictate that proposition. So do you dispute the notion that there's something different between the existence of a presumption or not? So I think the proper inquiry under Gardner, Your Honor, is whether there was a significant risk of increasing the length of his incarceration. And so whether the jots and tittles of the presumption between the two guideline regimes don't matter, unless it would have been clear in 2000, 2005, or 2008 to a reasonable parole commissioner that this presumption actually does, under Gardner, significantly increase the risk of lengthening his incarceration. And under this Court's opinion in Daniel, which was a general case with multiple plaintiffs, not about money damages, the Court was very clear that in order to prevail, you would have to show that as applied, a prisoner would have to show that as applied to him or her, the significant risk was manifest. And so I think this presumption, you know, whatever the effect of the presumption, it is not – there's nothing in the record to suggest, and in fact the record contradicts, that there was a significant risk of increasing the length of Mr. Johnson's incarceration as a result of whatever the presumption might have been in any of these hearings. And when you say the record does that, that's because of what happened in 2010? I think that's because of what happened in 2010. It's because of the reasons the Commission gave at each of his parole hearings. So in each of his hearings, if you go through them, the Commission departs upward because it says that Mr. Johnson was on bond for a rape and then committed another rape and then hadn't obtained psychological counseling and treatment while he was in prison. And so you can go through that. That's Appendix 50 to 52 for the 2000 hearing, Appendix 57 for the 2005 hearing, and Appendix 64 for the 2008 hearing. Just to give you an example of what I'm referring to, on Appendix 64 the Commission says it made another, quote, decision above the current total guideline range, end quote, because Johnson was, quote, a more serious risk, end quote, than his score indicated. So I think if you actually look at what the Commission did, it's very clear that it would have done the same thing under either set of guidelines. And I think the Commission has confirmed that when in 2010 it did what a responsible official is supposed to do, which is say, you know, gee, there might be a next post facto issue here. We have this district court litigation. We should make sure that we're not going anywhere near violating a clearly established right, and just go ahead and recalculate all of his parole hearings using the prior enacted guidelines. And so your argument would be the same even if Daniel had come along and had been decided in 2000? So I think my argument is yes. I think my argument is much stronger because Daniel's not until 2014. But yes, I mean, even under Daniel, if you actually look at Daniel, Daniel has a group of prisoners, okay, all making undifferentiated claims about the 87 guidelines versus the 2000 guidelines. And Daniel says, you know, look, I'm just looking at these things on their face. It's possible, taking all the inferences in favor of this group of individual plaintiffs, that some plaintiff might have had his rights violated under the ex post facto clause as a de novo matter because that was an injunctive case, not a money case. But I think if you read Daniel and actually apply it to the particulars of this case in this complaint, Daniel itself would have said, no, this is not a cognizable claim. Daniel would have said that, why? Because in Daniel itself, the court was very clear that you had to be able to show relief as applied to your particular case. So in Daniel, the court had before it three or four, I forget, maybe five prisoners who all were still incarcerated and who all were seeking an injunction to get them exactly what Mr. Johnson already received, which is a new parole hearing recalculating all of their parole under the prior enacted guidelines. And so what Daniel says is it's possible that that is required in some case, just looking at the two guidelines regimes on their face, but in order to state a claim, you'd have to show more. You'd have to show that, you know, to actually, I'm sorry, to prevail on a claim, you'd have to show that the guidelines as applied to you created a significant risk of prolonging your detention. And so I think here... So you're effectively arguing that the presumption means nothing. I... If you could get to the same result. I mean... So, Judge Edwards... The two sides are far apart on this point on the presumption. So, Judge Edwards, I think I'd say it like this. I think if we were in the D.C. Court of Appeals and this was some sort of a direct appeal of under D.C. law of whether they properly applied the presumption, it's possible the presumption matters. But the standard that Amicus has to clear is much higher than that, because under Garner they have to show that the application of the latter enacted regime created a significant risk of prolonging, actually prolonging the person's incarceration. And so, Judge Edwards, on this record, I would say that the presumption is not nearly enough to do that, because the Commission told us in all of these parole determinations that it would have deported upward and kept Mr. Johnson, would have denied him parole  So that's my answer to that, Judge. That after-the-fact recalculation is not suspect because it's self-serving? I'm sorry, Your Honor? That after-the-fact recalculation is not suspect because it's self-serving? I don't think so, Your Honor, because it wasn't even done in response to this litigation. So the Commission adopted a policy in 2009 where there had been some district court litigation over this issue and said, you know what, we're not going to risk any issue. We're going to go ahead and redo everybody's parole that wants it that was convicted under the 87 guidelines, and then they went ahead and did it. So I think – I don't think so, Your Honor. So Daniel says at page 63, just concluding the part about the presumption, and we think it reasonable to infer that the presumption of extended unsuitability contained in the 2000 guidelines would prolong a prisoner's period of incarceration as compared to the 1972 guidelines in which no such presumption existed, even if the same factors could have been considered under the earlier regime. So it makes it sound like the existence or nonexistence of a presumption was thought by Daniel to be a pretty big deal in the abstract. Yes. I think in the abstract the existence or nonexistence of the presumption could be a big deal when you're taking all the inferences in favor of a plaintiff on a 12b6. It seems if Daniel were on the books, that's a pretty – one would say, I think the amicus would say,  even at the time that these hearings took place, that it still wouldn't have been an ex post facto or qualified immunity or even for qualified immunity purposes a problem to apply these. So, again, I don't quarrel with Your Honor's suggestion that Daniel would – if he had been on the books in 2000, if Garner were replaced with Daniels in 2000, this would be a more difficult case for the commissioners. No question. But I think if you look at this Court's decision in Taylor v. Riley, which is week 12, I think it's about the same time as Daniel. What the Court there says, and this is quoting from Garner, and this is on page 1,014 – I'm sorry, 1,114 of the Court's opinion, is the trait, end quote, significant risk, quote, as applied to his own sentence. And so I think, you know, in the abstract, this presumption could be significant. But I think in the particular of this case, where you actually know what happened in all of these parole hearings because they're all in the record, it's clear that as applied to Mr. Johnson's own sentence, the presumption wouldn't have made a difference. Hence, there's no – or at least would not have made such a difference that it would constitute a significant risk of prolonging his incarceration, which is what Garner requires. And I think it's beyond doubt that, you know, even if you disagree with all that, none of this would have been clear to the average parole commissioner in 2008, which is the latest enactment. So you – I mean, as I'm hearing you, the recalculation is critical to your argument. So I think we would win either way, Judge Edwards, because all we're talking about is qualified immunity and whether it would have been clear in 2008. I think the recalculation takes this – I mean, I think that puts it beyond doubt. But even if there hadn't been a recalculation, I think it would have still not been clear to the average commissioner in 2008 that what Amicus is suggesting is an ex post facto violation actually was. Because of Ford or without regard to Ford? Well, I think Ford certainly helps, Your Honor. But, you know, we wrote our brief before Ford, and we anticipated the rule of Ford, which is based on the D.C. – which is based on D.C. law in cases like McRae, which is cited both in our brief and in the Court's fine opinion in Ford. Thank you, Your Honor. If there's no further questions. All right. Thank you. Does Mr. Gilstrap have any time left? Mr. Gilstrap has one second. All right. Why don't you take two minutes? Thank you, Your Honor. I appreciate it. Just a few brief points. As Judge Srinivasan noted, that language in Daniel is very important and helpful and shows that presumptions do, in fact, matter. And the government suggested that we've somehow not shown that, as applied to this case, that that would have, in fact, mattered. But we've shown that the presumption did actually flip in 2000, and even if you look at the 2010 re-sentencing, re-parole commission guidelines, that his range of unsuitability was actually shorter compared to his earlier. So under Daniel, I think that that after-the-fact re-parole hearing doesn't solve all the problems. On Ford, just very briefly, Ford did not address the issue of qualified immunity. And, again, to the extent that the government tries to expand Ford as broadly as it has, I think, as Judge Srinivasan recognized, there's real tension with Daniel to the extent that it is construed that broadly. Those are the main points I wanted to cover. And for those reasons, as well as those stated in our brief, we believe that the district court's judgment should be reversed and the matter remanded for consideration of the Section 1983 damages claim. All right. Mr. Gilstrap, you also were appointed by the court to represent as amicus, and you've done an excellent job. And unless you are a parole expert normally, you've done an even extraordinary job going through all of these different statute cases. That is not my day job, so I appreciate it, Your Honor. Thank you. Thank you.
judges: Henderson, Srinivasan, Edwards